# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**FRANCINE KADLETZ**
        **Plaintiff,**

    **v.**                                  **Case No. 09-C-1101**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

On March 24, 2006, plaintiff Francine Kadletz applied for supplemental security income ("SSI"), claiming inability to work as of January 1, 2003, due to neck and back pain, psoriatic arthritis, and depression. (Tr. at 100-02; 117.) The Social Security Administration ("SSA") denied her claim initially (Tr. at 53) and on reconsideration (Tr. at 54), as did an Administrative Law Judge ("ALJ") after a hearing (Tr. at 10-20). The SSA's Appeals Council then denied plaintiff's request for review (Tr. at 1), making the ALJ's opinion the SSA's final decision for purposes of judicial review. See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). Plaintiff now seeks such review.

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

The court reviews an ALJ's decision deferentially, affirming if it is supported by substantial evidence. Id. at 874 (citing Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)). Thus, if reasonable minds could differ as to whether the claimant is disabled, the ALJ's decision to deny the claim should be affirmed. See Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009).

But this does not mean that the court acts as an uncritical rubber stamp. Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984). The court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision, Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), and ensuring not only that the decision has adequate support in the record but also that the ALJ built an accurate and logical bridge between the evidence and the result, Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003). Similarly, if the ALJ commits an error of law, reversal is "required without regard to the volume of evidence in support of the factual findings." Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ commits legal error if he fails to comply with the SSA's regulations and rulings for evaluating disability claims. See, e.g., Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004).

**B.    Disability Standard**

The ALJ determines whether a claimant is disabled under a five-step, sequential test. See 20 C.F.R. § 416.920(a)(4). Under this test, the ALJ asks (1) whether the claimant is unemployed; (2) if so, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner as presumptively disabling; (4) if not, whether the claimant can, given her residual functional capacity ("RFC"), perform her past relevant work; and (5) if not, whether the claimant is capable of performing other work in the national economy. See, e.g., Simila, 573 F.3d at 512-13.

2

## II. FACTS AND BACKGROUND

**A.     Medical Evidence**

> **1.     Treatment Records**

The medical records in the transcript begin in December 2003, with a notation that plaintiff was prescribed Effexor, an anti-depressant. (R. 159.)  In May 2004, she saw a doctor for finger swelling (Tr. 159), and the following month she was referred to a rheumatologist (Tr. at 160).  In February 2005, she complained of tingling and shooting pain in both arms.  (Tr. at 160.)  A nurse noted a red, patchy rash on plaintiff's right arm and both hands, assessed psoriatic arthritis, and referred plaintiff back to her rheumatologist, a Dr. Russell.  (Tr. at 160.) X-rays taken on May 2004 revealed no evidence of fracture or joint abnormality in plaintiff's left hand.  (Tr. at 164.)

On July 27, 2005, plaintiff saw Dr. Scott Derse to establish primary care after moving to the Sheboygan, Wisconsin area.  Dr. Derse noted that plaintiff had a diagnosis of mild psoriasis, but that over the past few years she had developed symptoms suggestive of psoriatic arthritis, including pain and swelling in the hands, left shoulder, and right knee.   On examination, Dr. Derse noted some sausage-type fingers, but shoulder and lower extremity exams were normal.  Dr. Derse diagnosed psoriatic arthritis and referred her to Dr. Robert Ehrhart, a rheumatologist, and advised her to take over-the-counter anti-inflammatories.  (Tr. at 165.) X-rays of plaintiff's left hand showed mild joint space narrowing and moderate spurring at the DIP joint of the second digit, moderate joint space narrowing and spurring at the DIP joint of the left third digit, and mild soft tissue swelling of the DIP joints of the left second and third digits.  No other significant abnormalities were identified.  (Tr. at 167.)

Case 2:09-cv-01101-LA   Filed 07/26/10   Page 3 of 33   Document 20

Plaintiff saw Dr. Ehrhart on August 4, 2005, and he noted that she had previously been prescribed various non-steroidal, anti-inflammatory drugs, as well as Methotrexate,[1] by Dr. Russell, without effect. On exam, Dr. Ehrhart noticed some swollen fingers but plaintiff's wrists and elbow were not swollen. Her shoulders were also not swollen, but she had pain with range of motion of the left shoulder. Her right knee had small to moderate effusion. Dr. Ehrhart diagnosed psoriatic arthritis and prescribed the medication Enbrel.[2] (Tr. at 168-69.)

Plaintiff returned to Dr. Derse on August 12, complaining of on-going depression. She indicated that she took medications for this in the past, including Lexapro, Wellbutrin, and Effexor, which did not help significantly. She complained of insomnia, mood instability, hopelessness, and anhedonia. Dr. Derse diagnosed major depression and provided samples of Cymbalta. (Tr. at 170.)

Plaintiff returned to Dr. Ehrhart on August 17, continuing to complain of pain and stiffness after her first injection of Enbrel. Dr. Ehrhart advised her to continue with the Enbrel. (Tr. at 172.)

Plaintiff next saw Dr. Derse on September 2, reporting no relief in her depressive symptoms with Cymbalta. Dr. Derse decided to refer her to a psychiatrist for further assistance managing her depression. (Tr. at 202.)

Plaintiff returned to Dr. Ehrhart on September 14, reporting no real improvement with Enbrel and worsening mood when she took it. The doctor discontinued Enbrel for one month

---

[1] Methotrexate is used to treat severe psoriasis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000547.

[2] Enbrel is an injectable medication used to relieve the symptoms of certain autoimmune disorders, including psoriatic arthritis (a condition that causes joint pain and swelling and scales on the skin). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000193.

4

and ordered tests.  (Tr. at 204.)

On October 3, plaintiff saw psychiatrist Dr. Edmund Dy, on referral from Dr. Derse, complaining of low energy, lack of motivation, low mood, and isolation.  She was able to manage her household, but with low energy and difficulty concentrating.  On mental status exam, Dr. Dy noted plaintiff's affect was sad, flat, anxious, and nervous.  He diagnosed major depression, with a GAF of 60,[3] and increased her Cymbalta dosage.  He also filled out a form recommending that she "work at 6-hour maximum because of tiredness and concentration problems."  (Tr. at 176-77; 318-19.)

On October 10, plaintiff requested that Dr. Derse fill out a disability form. He arranged for a functional assessment to be done in the physical therapy department.  (Tr. at 208; 240.)

Plaintiff saw Dr. Ehrhart on October 12, no better or worse than last time.  On exam, the doctor noted some swelling of the fingers of her left hand and puffy toes.  He wanted to continue Enbrel, but given her previous reaction decided to try another medication, Sulfasalazine.[4]  (Tr. at 209; 255.)

Plaintiff returned to Dr. Dy on October 31, noting that the Cymbalta had not made much of a difference.  She continued to be unmotivated, sad, and isolative.  She completed her activities of daily living ("ADL's"), cooking, cleaning, and basic housework but with little

---

[3]"GAF" stands for "Global Assessment of Functioning."  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

[4]This drug is used to treat arthritis in those whose disease has not responded well to other medications.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000610.

5

motivation.  On mental status exam, Dr. Dy noted sad mood, flat affect, and fair judgment and insight.  Dr. Dy diagnosed major depression, with a GAF of 60.  He continued Cymbalta but added Wellbutrin, hoping for improvement with multiple medications.  (Tr. at 320.)

On November 9, plaintiff saw Dr. Derse, who noted that the functional assessment he ordered showed that plaintiff was capable of an eight-hour day doing light duty work.  (Tr. at 211; 241.)  The same day, plaintiff saw Dr. Ehrhart, tolerating the Sulfasalazine well but not feeling any better.  Dr. Ehrhart continued Sulfasalazine and scheduled a return in two months. (Tr. at 213; 257.)

On December 9, plaintiff saw a counselor, Debra Moths, MSW, LCSW, on referral from Dr. Dy, reporting problems with depression, anxiety, and mood swings.  She described herself as isolated and withdrawn, spending most of her time in her apartment.  She stated that her medications, Cymbalta and Wellbutrin, were only very marginally helpful.  She described difficulty with sleep and appetite, as well as negative thought trends, anxiety, and depressed moods. Ms. Moths found that plaintiff appeared depressed and a-motivational with a flat affect, and assessed major depressive disorder, single episode, moderate, with a current GAF of 60. (Tr. at 313-14.)

Plaintiff returned to Moths on December 23, complaining of depression and chronic pain. She continued to be quite inactive and spent most of her time at home.  She also noted financial problems.  Moths again diagnosed major depressive disorder, recurrent, moderate. (Tr. at 315.)  Plaintiff also saw Dr. Dy on December 23, making slow improvements only, still sad with low motivation.  Dr. Dy increased Wellbutrin and diagnosed major depression with a GAF of 65.  (Tr. at 323.)

On January 11, 2006, plaintiff told Dr. Ehrhart that she had stopped taking Sulfasalazine

due to nausea and was at the time using nothing but ibuprofen and Tylenol. On exam, Dr. Ehrhart noted some enlargement and tenderness of several of her hand DIP joints, and many of her toes had a sausage-like appearance. Dr. Ehrhart decided to try another drug, Humira.[5] (Tr. at 217; 259.)

Plaintiff returned to see Ms. Moths on January 23, reporting no significant change in mood despite the change in medication. She continued to spend most of her time at home with few activities, and still had mood swings with irritability and sadness. They discussed ways to deal with irritability and to increase her activity level, including exercise or volunteer work. Moths diagnosed major depressive disorder, recurrent, moderate. (Tr. at 327.) Plaintiff also saw Dr. Dy on January 23, apparently telling him she was doing a little bit better, able to function and have a little bit of fun. She still complained of poor energy and sleep difficulty. Dr. Dy diagnosed major depression with a GAF of 70 and provided Ambien to help with sleep. (Tr. at 325.)

On February 16, plaintiff saw Dr. Charles Strancke in the emergency department for right shoulder and neck discomfort, gradually worsening over the past three days. Dr. Strancke diagnosed right para-cervical muscle spasms with right upper extremity paresthesia and provided medications. (Tr. at 194-95.) Plaintiff returned to the urgent clinic complaining of right shoulder pain on February 18, and the doctor provided more medication and recommended follow-up with her primary provider. (Tr. at 190-91.)

Plaintiff saw Dr. Derse on February 21, complaining of severe right posterior shoulder

---

[5]Humira is used alone or with other medications to relieve the symptoms of certain a u t o i m m u n e    d i s o r d e r s ,    i n c l u d i n g    p s o r i a t i c    a r t h r i t i s . http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000219.

7

pain and upper arm pain. He provided a trigger point injection and ordered an MRI. (Tr. at 219-20; 245-46.) Plaintiff's thoracic spine was normal (Tr. at 222; 263), but the scan of her cervical spine revealed a small disc herniation at C4-5 and a very large hernation at C6-7 (Tr. at 224-25; 265-66). On February 25, plaintiff visited the ER related to complaints of severe right upper extremity and right shoulder area pain. The doctor prescribed Percocet and, noting the MRI, referred her to Dr. Jonathan Pond, a surgeon. (Tr. at 188-89.) Plaintiff saw Dr. Pond on February 28, and he scheduled an epidural injection, with surgery recommended if that failed. (Tr. at 226-29; 250-53.)

On March 7, plaintiff saw Dr. Strancke related to her complaints of ongoing, chronic right neck and arm pain. She reported taking up to ten oxycodone pills per day, without relief. (Tr. at 185.) Dr. Strancke started plaintiff on Neurontin and initiated physical therapy. (Tr. at 186.) After three sessions, therapy was terminated due to pain and lack of progress. (Tr. at 180-84.) On March 15, plaintiff underwent a cervical epidural steroid injection, with no relief. (Tr. at 178.)

Plaintiff returned to Dr. Ehrhart on March 28, noting that her arthritis was about the same. She had not started on Humira because her insurance did not cover it. Dr. Ehrhart wanted to try Humira, if approved, or Enbrel again after plaintiff's planned cervical surgery. (Tr. at 231; 261.) On April 7, plaintiff underwent an anterior cervical decompression with diskectomy and removal of the herniated disc, and a fusion from C6 to C7. (Tr. at 233; 248; 273-74; 276-77; 278.)

On April 27, plaintiff saw Dr. Dean Olson at the urgent care clinic, complaining of progressively worsening symptoms on the left side, similar to the right side before the surgery. Dr. Olson recommended that she call Dr. Pond the next day. (Tr. at 271-72.)

On May 1, plaintiff returned to Dr. Derse, doing very well, with her neck pain essentially gone. She reported taking no pain medications since a day or two after the surgery. (Tr. at 281.) She saw Dr. Pond the same day, reporting no significant neck pain, a little posterior stiffness, and that her arm symptoms were dramatically improved. (Tr. at 283.) A cervical x-ray revealed no post-operative complications. (Tr. at 285.) On May 24, plaintiff told Dr. Pond that her radicular pain had resolved and her neck pain was significantly improved. X-rays again showed appropriate position at the graft. (Tr. at 331; 343.) Plaintiff also saw Dr. Ehrhart on May 24, reporting that she used no medication for pain or arthritis. Plaintiff said she was stiff in the morning for a couple hours. Dr. Ehrhart suggested trying Enbrel again, but plaintiff demurred until she had recuperated more from the neck surgery. (Tr. at 337.)

On June 6, plaintiff returned to Dr. Dy, doing "okay at this time." (Tr. at 328.) She stated that her moods went up and down, but she was able to function and have fun and was sleeping okay with medication. She reported occasional sadness and crying spells, generally situational. Dr. Dy diagnosed major depression with a GAF of 75 and continued her medications as before. (Tr. at 328.)

Plaintiff saw Dr. Pond on July 21, reporting that her right arm pain was gone but she still had some weakness in the right arm. Her neck felt good overall. However, she did report a flare-up of psoriatic arthritis in her hands. Dr. Pond allowed her to increase her lifting to up to thirty pounds and scheduled a re-check in three months. (Tr. at 335.) X-rays were again unremarkable. (Tr. at 345.)

Plaintiff saw Dr. Ehrhart on August 1. He noted, "As always, she is quite uncomfortable with a lot of pain and morning stiffness, particularly in her hands." (Tr. at 339.) Her grip strength was reduced, and on exam he noted tenderness and slight swelling of the numerous

9

IP joints and of both wrists, with some tenderness in the ankles and feet as well.  Dr. Ehrhart prescribed a six month course of Enbrel.  (Tr. at 339.)

On August 29, plaintiff returned to Dr. Dy, not sleeping very well.  She also complained that Wellbutrin made her ill, so Dr. Dy discontinued it.  She reported that she was still anxious, nervous, worried, with low motivation and energy, and unable to function.  She was able to do ADL's and shop for her needs, but that was it, and it took longer at times.  Dr. Dy diagnosed recurrent depression, with a GAF of 70.  (Tr. at 381.) Plaintif also saw Dr. Ehrhart on August 29, indicating that she had decided not to use Enbrel.  The doctor noted some swelling and tenderness around several IP joints.  He filled out some forms for her social worker so she could continue to get food stamps and stated: "It is hard to say whether her disability now is primarily her arthritis or her psychiatric problems, but between the two it does not seem likely that she is going to be able to hold down a job in the near future."  (Tr. at 403.)

Plaintiff returned to Dr. Ehrhart on November 26, complaining of a lot of pain in her lower extremities that seemed rather diffuse.  She was taking over the counter ibuprofen and did not want to try Enbrel again because it made her depressed when she previously tried it.  A couple of the DIP joints on the left hand were markedly enlarged and a little tender, and she had small knee effusions bilaterally.  Dr. Ehrhart suspected a certain amount of chronic pain syndrome separate from her psoriatic arthritis.  Since she was not interested in a biologic medication and had failed an adequate trial of Methotrexate, he had nothing to offer but non-steroidals.  He called in a prescription for ibuprofen 800 mg. He also ordered x-rays of the hands, feet, knees, and hips.  (Tr. at 401.)  The x-rays of the hands revealed no significant changes since a July 27, 2005 exam, with some mild soft tissue swelling with some narrowing and hypertrophic changes at the DIP joint of the long and index fingers.  The scans revealed no issues with the

10

pelvis and hips, and no obvious problems with the knees. The feet x-rays did show some deformity of the distal first metatarsal of the right foot and some degenerative change of the first metatarsophalangeal joint, with no other significant abnormalities. (Tr. at 410.)

Plaintiff returned to Dr. Dy on November 27, still having the same problems, with low mood and energy. She also complained of memory problems with short-term forgetfulness. Dr. Dy increased Cymbalta and Seroquel to help sleep, and he diagnosed recurrent depression, with a GAF of 70. (Tr. at 379.) Plaintiff also saw Dr. Pond that day, reporting no right arm pain, no numbness, but still some weakness in her triceps and occasional tightness in her neck. Dr. Pond was disappointed that she did not regain full strength in her triceps, but found that was an indication of the nature of her nerve injury prior to decompression. (Tr. at 390.) X-rays of the cervical spine revealed no evidence of complications. (Tr. at 411.)

Plaintiff saw Dr. Ehrhart on December 28, stating that ibuprofen took the edge off of the pain. Dr. Ehrhart stated that one of the reasons she did not seem to respond well to treatment was that an "awful lot of her symptoms seem to be more tied in with her chronic depression than actually active psoriatic arthritis." (Tr. at 399.) She was uninterested in Humira or Enbrel, so Dr. Ehrhart instructed her to continue with ibuprofen. (Tr. at 399.)

The medical records then skip to mid-2007, with a June 13, 2007, x-ray of the right knee ordered by Dr. Olson after plaintiff fell. The scan was negative. (Tr. at 409.)

On July 6, 2007, plaintiff saw Dr. Denis Pleviak complaining of low back pain of two months' duration. Dr. Pleviak suspected mechanical low back pain, more than likely related to facet joint etiology. He instructed her to use Piroxicam[6] and start doing a back mobilization

---

[6]Piroxicam, a non-steroidal anti-inflammatory medication, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis.

program.  He also suggested physical therapy, but she was not interested in that.  (Tr. at 397.)

A lumbar spine x-ray taken in August 2007 revealed mild degenerative changes.  (Tr. at 407.)

On August 15, plaintiff returned to Dr. Derse complaining that her hands and feet were going to sleep.  Plaintiff had a normal neurologic exam with subjective sensory symptoms.  Dr. Derse ordered various tests and indicated that, if symptoms persisted, he would recommend a neurology consult.  (Tr. at 395.)

Plaintiff saw Dr. Dy on August 24, noting that an increase in Seroquel helped with sleep. Plaintiff noted somewhat limited activity and social isolation.  She reported being not sad, but not happy either, just neutral.  (Tr. at 378.)

On August 28, plaintiff saw Dr. Ehrhart, complaining of more inflammation than the last time he saw her.  "She says she definitely cannot work with the discomfort she is having in her hands and feet.  She is still very, very unwilling to resume Enbrel or try another TNF drug."  (Tr. at 393.)  On exam, her left fourth PIP joint and the left second and third DIP joints were somewhat swollen, slightly erythematous,[7] and quite tender.  Several of her toes had a sausage-type of swelling.  Dr. Ehrhart suggested a trial of Leflunomide,[8] which plaintiff agreed to try.  (Tr. at 393.)

On October 16, 2007, plaintiff saw Sharon Albrecht, PA-C, at the urgent care clinic, for pain in her left lower back over the past week, unimproved with ibuprofen.  PA Albrecht

---

http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000826.

[7]This refers to redness due to capillary dilation.  Stedman's Medical Dictionary 615-16 (27th ed. 2000).

[8]This drug is used to treat rheumatoid arthritis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000005.

12

diagnosed chronic low back pain, stopped ibuprofen due to GI upset, and started plaintiff on Etodolac.[9]  She also recommended physical therapy, but plaintiff declined due to lack of transportation and was given home exercises she could do.  (Tr, at 391-92.)

Plaintiff returned to Dr. Dy on February 7, 2008, reporting that she had gained about thirty pounds with Seroquel and wanted to try something else; Dr. Dy prescribed Ambien. Plaintiff reported that her moods had been stable, and she was able to function and have fun and to socialize when needed.  Dr. Dy diagnosed recurrent depression with anxious features and a GAF of 90.  (Tr. at 376.)

On February 7, plaintiff saw Lynn Wilderman, P.A., at the family practice clinic, reporting some numbness and tingling, for about thirty seconds to a minute, a couple times per day on her left, fifth finger.  PA Wilderman assessed cubital tunnel syndrome versus ulnar neuritis, and suggested that she ice the elbow and follow-up with Dr. Ehrhart.  (Tr. at 388-89.)

Plaintiff returned to Dr. Dy on March 24, doing okay with stable mood.  She was able to do her ADL's, but her memory was still a little bit limited, and she was not sleeping well.  Dr. Dy increased her Ambien and diagnosed recurrent depression with anxious features, in remission, and a GAF of 90.  (Tr. at 374.)

On May 1, plaintiff saw Dr. Olson at the urgent care clinic, complaining of low back pain of several months' duration, worse in the past several days.  Examination findings were largely unremarkable, and x-rays demonstrated no fractures or dislocations.  Dr. Olson diagnosed low back pain with muscle strain, and instructed plaintiff to rest and not lift more than ten pounds;

---

[9]This drug is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000904.

13

he also prescribed Vicodin and Flexeril. (Tr. at 387.) X-rays ordered by Dr. Olson showed mild degenerative spurring of the lumbar spine, not significantly changed from August 2007, negative for fracture or spondylolisthesis. (Tr. at 405.)

On June 16, plaintiff returned to Dr. Dy, doing okay with stable moods and improved sleep after the Ambien increase. She reported tolerable energy, fair moods, with the ability to function and have fun. Dr. Dy diagnosed recurrent depression with anxious features, in remission, and a GAF of 90. (Tr. at 372.)

On June 27, plaintiff saw PA Wilderman complaining of right knee pain and occasional swelling. PA Wilderman diagnosed patellofemoral disorder with possible underlying arthritis and advised plaintiff to use quad strengthening exercises and take Glucosamine. (Tr. at 384-85.)

On October 4, plaintiff saw Dr. Olson at the urgent care clinic, complaining of fainting, lightheadedness, and dizziness. She had discontinued Cymbalta abruptly after her insurance was cut off and lacked the funds to re-start the medication. Tests were normal, and Dr. Olson attributed the symptoms to medication withdrawal. (Tr. at 382-83.)

On November 26, 2008, Dr. Pond prepared a report in which he reviewed and endorsed the restrictions listed in a functional capacity evaluation performed by Keith Hatch, PT, OCS, a board certified orthopedic clinical specialist. Hatch evaluated plaintiff's physical ability for work in light of her cervical fusion and psoriatic arthritis. Hatch indicated that plaintiff's ability to lift was limited by her neck pain, limited range of motion, and limited tolerance for repetitive grasping. Walking, carrying, and standing were limited due to neuropathic changes/pain to the legs associated with the psoriatic arthritis. Hatch wrote that his findings suggested that plaintiff would be unable to support the occasional lifting, repetitive grasping, and fine motor activity

14

required for full-time sedentary work.  These restrictions were supported by plaintiff's inability to maintain pace and strength of repetitive grasping and pinching, and limited lifting ability from knees to overhead, working overhead, and carrying.  He indicated that she could rarely lift or carry less than ten pounds, never more; sit eight hours per day; stand one hour per day, not to exceed fifteen minutes per episode; walk one hour per day, not to exceed fifteen minutes per episode; rarely push and pull less than ten pounds; never engage in repeated twisting, forward bending, or kneeling; never engage in gross manipulation or fine motor manipulations with the left hand and 25% of the day with the right; and never work overhead, due to limited cervical range of motion.  Hatch further opined that plaintiff would likely need more than ten unscheduled breaks during an eight hour workday, with each break lasting five to ten minutes.  The results suggested that she gave a sincere effort.  Dr. Pond agreed that plaintiff should engage in no overhead activity but due to shoulder/neck pain, not range of motion.  He also stated that plaintiff's decreased use of the left arm was due to psoriatic arthritis in the hand, not to residuals from the spine.  (Tr. at 412-15.)

**2.     SSA Consultants**

In a May 30, 2006 physical RFC assessment, Dr. Dar Muceno concluded that plaintiff could perform the exertional requirements of light work (lifting up to twenty pounds occasionally, ten pounds frequently; standing and/or walking about six hours in an eight hour workday; and sitting about six hours in an eight hour workday), with limited reaching, handling and fingering.  (Tr. at 287-94.)[10]  In a May 31, 2006, psychiatric review technique report, Michael Mandli, Ph.D, evaluated plaintiff under Listing 12.04, Affective Disorders, finding a

---

[10]On October 26, 2006, Dr. Michael Baumblatt reviewed and affirmed this assessment. (Tr. at 355.)

15

severe mental impairment. Dr. Mandli found no degree of limitation in activities of daily living; mild difficulty in social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 295-308.) In an accompanying mental RFC report, Dr. Mandli found moderate limitations in seven categories and no significant limitation in thirteen. (Tr. at 309-12.) On October 26, 2006, Eric Edelman, Ph.D, completed a psychiatric review technique report, finding no severe mental impairment, with no restriction of ADL's; mild restriction of social functioning; mild difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 356-68.)

## B.    Hearing Testimony

At the hearing, plaintiff's counsel amended the onset date from January 1, 2003 (Tr. at 113) to February 24, 2006 (Tr. at 25), the date of the MRI detecting plaintiff's herniated cervical discs (Tr. at 27). Plaintiff then testified, stating that she was thirty-eight years old, with a high school education. (Tr. at 28.) She indicated that she was unemployed and last attempted to work in September 2008 for a cleaning company, but lasted just one week because she could not handle the physical demands of the job. (Tr. at 29-30.) From 1998 to 2002, she worked as a food service worker in the Milwaukee Public Schools, leaving when the lifting, bending, and standing required by that job became too hard for her. (Tr. at 30-3131.) She testified that in 1993, she worked as a telemarketer for less than a year, leaving that job when the company closed. (Tr. at 31.)

Plaintiff testified that her neck was always sore and she felt pain when he tried to lift anything. She also complained of back pain whether sitting, standing, or walking. Plaintiff indicated that she underwent neck surgery in April 2006, after which she was bedridden for three months. (Tr. at 32.) She later clarified that she was bedridden before the surgery. (Tr.

16

at 33.) She also complained of weakness and heaviness in her right arm after the surgery, with tingling running up and down the arm. (Tr. at 32.) The ALJ asked her about the May 2006 medical records from Dr. Pond indicating that her pain was significantly improved after the surgery, and she admitted that the pain was better after the surgery, but the sensitivity in her neck and the stiffness and problems with her arm remained. (Tr. at 33.)

The ALJ also asked about her dealing with therapist Hatch, and she indicated that she had not seen Hatch aside from the assessment, that she was sent there by her lawyer, and that she spent over an hour with Hatch. She did not provide Hatch with her medical records. (Tr. at 34.) She testified that she had seen Dr. Pond about ten times since her surgery, mostly right after the operation. She last saw him on November 26, 2008, the day he filled out the report. She testified that Dr. Pond did examine her that day; before that, she had not seen him in about a year. He only treated her neck. (Tr. at 35.)

Plaintiff testified that Dr. Ehrhart treated her arthritis, and she saw him every three months. She indicated that the arthritis caused swelling in her fingers and hands, pain, and difficulty grabbing and holding things. (Tr. at 36.) She testified that she dropped things such as coffee cups and hot pans trying to lift them off the burner or out of the oven. She had a hard time with buttons and snaps and with tying her shoes. (Tr. at 45.) Dr. Ehrhart provided numerous medications in the past, which had no effect; she currently took no medications (Tr. at 36) aside from over-the-counter ibuprofen six to seven times per day (Tr. at 42). Nothing made the swelling in her hands go down. To relieve pain she used a heating pad and soaked her hands in hot water. (Tr. at 43.) She also indicated that her feet swelled every day, making it hard to put on shoes. (Tr. at 46.)

Plaintiff testified that she saw Dr. Dy for her depression, with the last visit about six

17

months prior to the hearing. (Tr. at 37.) She did not currently see anyone for depression because she lacked insurance. She testified that her depression kept her in the house, laying in bed in the dark, isolated from others. She cried a lot and got angry for no reason. She no longer took medication due to a lack of insurance. (Tr. at 38.)

Plaintiff testified that she could walk a couple of blocks before her back and feet hurt; stand about fifteen minutes before she had to sit due to pain in her feet or back; and sit for about ½ hour before she had to get up and move. (Tr. at 38-39.) She stated that lifting a gallon of milk was hard for her. During a typical day, she did little things around the house – dishes, some cleaning – otherwise she hid in her room. (Tr. at 39.) She was able to cook but had her daughter lift hot pans due to fear she would drop them. She would do some cleaning and vacuuming before she had to sit down and take a break. She was able to grocery shop but brought her daughter or a friend along to help with the bags. (Tr. at 40-41.)

The ALJ then called a vocational expert ("VE"), William Dingess, who classified plaintiff's past work as a food service worker as light and semi-skilled, and a telemarketer as sedentary and semi-skilled. The ALJ then asked a series of hypothetical questions. The first assumed a person of plaintiff's age, education, and work experience, able to lift up to ten pounds occasionally, and stand or walk about two hours and sit about six hours in an eight hour work day. The VE said that such a person could work as a telemarketer but not a food service worker. (Tr. at 49.) The person could also perform other jobs, including officer helper, hand packer, assembler, cashier, and industrial inspector. (Tr. at 49-50.) If the further limitation of only occasional reaching was added, none of these positions could be done, but the person could work as a surveillance system monitor. (Tr. at 50.)

The second hypothetical again assumed a person of plaintiff's age, education, and work

18

experience, able to lift up to ten pounds occasionally, stand or walk about two hours and sit about six hours in an eight hour work day, but with only occasional gross and fine manipulation. Such a person could not perform plaintiff's past work and the only other job would be surveillance system monitor. (Tr. at 51.) If the person was limited to rare gross and fine manipulation and reaching, that job would also be eliminated. (Tr. at 51.) If the person could rarely lift up to ten pounds, all of the jobs would be eliminated. (Tr. at 52.)

**C.    ALJ's Decision**

Following the five-step test, the ALJ determined that plaintiff had not worked since the date of her application, and that she suffered from the severe impairments of psoriatic arthritis, herniated disc in the neck, and depression, none of which met or equaled a Listing. (Tr. at 12.) The ALJ found that plaintiff's depression caused only mild restrictions of her daily activities, social functioning, and concentration, and that she experienced no episodes of decompensation. (Tr. at 13.)

The ALJ then determined that plaintiff retained the RFC for a full range of sedentary work. (Tr. at 14.) In so finding, the ALJ gave Hatch's physical capacity evaluation very little weight. (Tr. at 18-19.) Regarding plaintiff's depression, the ALJ noted that plaintiff's GAF scores improved with treatment, and that Dr. Dy noted in 2008 that her depression was in remission. While plaintiff appeared depressed and withdrawn at the hearing, the ALJ found no evidence to suggest that her depression caused more than mild limitations. (Tr. at 19.)

Based on this RFC, the ALJ concluded that plaintiff could perform her past relevant work as a food service worker and telemarketer. (Tr. at 19.) The ALJ therefore found plaintiff not disabled and denied the application. (Tr. at 19-20.)

19

### III.  DISCUSSION

Plaintiff argues that the ALJ erred in (1) finding that she could return to her past work at step four, (2) evaluating treating source opinions, (3) assessing the credibility of her testimony, (4) considering the state agency/SSA consultants' reports, and (5) evaluating her mental impairment.  I address each issue in turn.

### A.    Step Four Determination

The ALJ determined that plaintiff retained the RFC for the full range of sedentary work, then held that she was capable of performing her past relevant work as a food service worker and telemarketer.  As the Commissioner concedes, the ALJ erred in finding that plaintiff could return to the food service job, classified by the VE and the Dictionary of Occupational Titles ("DOT") as light work.  (Tr. at 49.)  This leaves the telemarketer job, which is a sedentary position, but the ALJ failed to determine whether this constituted "past relevant work."

A job may be considered "past relevant work" for purposes of the step four analysis when it constituted "substantial gainful activity" ("SGA"),[11] lasted long enough for the claimant to learn to do the job ("duration"), and was done within the past fifteen years ("recency").[12]  See SSR 82-62; 20 C.F.R. § 404.1565(a).  In a disability report submitted prior to the hearing, plaintiff wrote that she worked as a telemarketer, full-time, from 1993 to 1995.  (Tr. at 118.)  But

---

[11]The regulations set forth certain monthly earning levels that give rise to a presumption that a job constitutes SGA.  See 20 C.F.R. § 404.1574.

[12]Because a gradual change occurs in most jobs, after fifteen years it is no long realistic to expect that skills and abilities acquired in these jobs continue to apply.  The fifteen-year guide is intended to insure that remote work experience which could not reasonably be expected to be of current relevance is not applied to deny a claim.  When deciding whether a claimant is disabled, the fifteen-year period is generally the fifteen years prior to the time of adjudication.  SSR 82-62.  Here, the ALJ's decision issued in January 2009, meaning the fifteen year period commenced in January 1994.

20

at the hearing, plaintiff testified that she worked as a telemarketer for less than a year in 1993. (Tr. at 31.) More importantly, according to SSA records, plaintiff earned nothing at all in 1993, 1994, and 1995. (Tr. at 109.)[13] The ALJ did not address this conflicting evidence. Nor did he make a finding that plaintiff performed the telemarketer job within the previous fifteen years; that she performed it long enough to "have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation," SSR 82-62; or that the work constituted SGA.[14]

The Commissioner argues that the claimant bears the burden at step four, and that there is no requirement that the ALJ follow certain protocols in finding a previous job past relevant work. However, the record must contain substantial evidence supporting the ALJ's findings, and he must build an accurate and logical bridge between the evidence and the conclusion. See, e.g., Blakes, 331 F.3d at 569; Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Given the ALJ's failure to address the gap in the record or to explain his finding on this issue, I cannot uphold his step four determination.

The Commissioner contends that plaintiff's testimony that she did this job for "less than

---

[13]Indeed, at the reconsideration level, the SSA evaluator indicated that it appeared plaintiff had never worked at SGA levels, and she denied the claim to other work using Grid Rule 202.17 as a framework. (Tr. at 351.) According to the SSA's "Abbreviated DIB Review Sheet," plaintiff never earned more than $5282.43 in a year. These do not appear to be SGA-level earnings. See 20 C.F.R. § 404.1574(b)(2) (providing that for the years 1990-1999 average monthly earnings of $500 would ordinarily be considered SGA); see also Soria v. Callahan, 16 F. Supp. 2d 1145, 1149 (C.D. Cal. 1997) (discussing the SGA requirement).

[14]As noted above, the SSA's "Abbreviated DIB Review Sheet" records no employment from 1993 to 1995. It does indicate that plaintiff worked for "Professionally Speaking, Inc." which appears to be a telemarketing firm, for a brief time in 1996, earning $194.42. (Tr. at 109.) It is hard to see how this brief period of employment would constitute past relevant work.

21

a year" would support a finding that she did it long enough to learn the needed skills.[15]  He further notes that if the "less than a year" period lasted from, say, June 1993 to June 1994, the work would arguably fall within the fifteen year period.  Finally, he contends that because there is no question that the telemarketer job still exists – and plaintiff has not argued that it changed since she did it – the fifteen year guideline should not be strictly applied.  I cannot rely on such post-hoc justifications to uphold an ALJ's decision.  See Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  In any event, it is unclear based on plaintiff's testimony how much "less than a year" she did this job or precisely when the work occurred; the Commissioner points to no substantial evidence that plaintiff learned the needed skills during this time period; and, as noted above, the SSA's records show that plaintiff performed no work for pay between 1993 and 1995, and that she worked as a telemarketer for a very brief time (perhaps a week or two) in 1996.  Thus, even if the duration and recency requirements could be satisfied, it is hard to see how this work constituted SGA.  See Lauer v. Bowen, 818 F.2d 636, 639 (7th Cir. 1987) (holding "that 'previous work', in order to be considered 'past relevant work', must first be found to rise to the level of substantial gainful activity").

Finally, even if I could overlook these errors in finding the telemarketer job to be "past relevant work," the decision cannot stand.  The ALJ failed in setting RFC to account for any

_____

[15]The VE testified that this job was semi-skilled with an "SVP" of 3.  (Tr. at 49.)  "SVP" stands for "Specific Vocational Preparation" and "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  A job with an SVP of 3 usually takes 1 to 3 months to learn. http://www.occupationalinfo.org/appendxc_1.html#II.

limitations in plaintiff's use of the hands due to her arthritis, or any mental limitations due to her depression, despite finding both to be severe impairments. The full range of sedentary work generally requires "good use of the hands and fingers for repetitive hand-finger actions," SSR 83-10, and, according to the DOT and its companion volume, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), the telemarketer job in particular involves using a keyboard, keying data into a computer, and typing reports, with "occasional" reaching and handling, and "frequent" fingering, Ferguson v. Astrue, No. CIV-09-286-R, 2010 WL 1757312, at *2 (W.D. Okla. Apr. 26, 2010), adopted by, 2010 WL 1757303 (W.D. Okla. Apr. 30, 2010); Montgomery v. Astrue, No. EDCV 08-3368-JTL, 2009 WL 700050, at *5 (C.D. Cal. Mar. 13, 2009). It may be that the ALJ believed plaintiff's arthritis did not preclude these activities, but without some discussion of the issue I cannot uphold the decision. Similarly, an "ALJ cannot find a severe mental impairment and then fail to include any limitations based on the impairment in the RFC." Henning v. Astrue, 578 F. Supp. 2d 996, 1014 (N.D. Ill. 2008) (citing Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1036 (E.D. Wis. 2004)). The ALJ will have to take another look at these issues on remand.[16]

## B.    Treating Source Statements

Plaintiff put forward two treating physician statements in support of her claim. The first came from Dr. Pond, who reviewed and largely affirmed the evaluation completed by therapist Keith Hatch finding plaintiff incapable of full-time, sedentary work (Tr. at 412-15), and the second from Dr. Ehrhart, who stated in an August 29, 2006 note: "It is hard to say whether her

---

[16]In a footnote, the Commissioner notes that the VE, in response to the ALJ's hypothetical questions, identified other jobs plaintiff might be able to do. (Commissioner's Br. at 12 n.3.) However, the ALJ made no step five finding, and the Commissioner makes no argument that any step four error was harmless based on this evidence.

disability now is primarily her arthritis or her psychiatric problems, but between the two it does not seem likely that she is going to be able to hold down a job in the near future." (Tr. at 403.)

The ALJ gave the Hatch report "very little weight," finding it "not supported by the overall medical evidence of record." (Tr. at 18.) He noted that the Hatch evaluation was arranged by plaintiff's lawyer, and that plaintiff did not supply Hatch with her medical records. The ALJ also stated that the report provided no support for its conclusions, which appeared "in great part based on the claimant's subjective complaints of pain rather than a thorough records review and testing procedure." (Tr. at 18-19.) The ALJ further noted that Hatch's restrictions were contrary to previous restrictions from Dr. Pond, who found that plaintiff could lift up to thirty pounds. While Dr. Pond reviewed Hatch's report, the ALJ stated that Dr. Pond had not at that time seen plaintiff in about two years. Finally, the ALJ noted that Dr. Pond attributed some of plaintiff's limitations to arthritis, despite the fact that he did not treat plaintiff for that condition, and the ALJ thus gave Dr. Pond's opinions related to arthritis no weight; Dr. Ehrhart, who treated plaintiff's arthritis, was not asked to comment on Hatch's evaluation. (Tr. at 19.) The ALJ said nothing about Dr. Ehrhart's August 2006 note.

Under SSA regulations, opinions from a claimant's treating physicians are entitled to special consideration. If such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." SSR 96-8p; Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he may not simply reject it. SSR 96-2p. Rather, he must determine the weight to give the opinion by considering various factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which

24

the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight the ALJ elects to give the treating source opinion, he must always "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2). Opinions from non-physician providers, such as physical therapists, may not receive controlling weight, see 20 C.F.R. 404.1502; nevertheless, opinions from these medical sources are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file, SSR 06-03p; see also Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) ("Although Barrett is wrong to argue that a physical therapist's report should be given controlling weight, such reports are entitled to consideration.").

Plaintiff argues that the ALJ provided insufficient reasons for discarding the Hatch/Pond report. The ALJ stated that Dr. Pond had not seen plaintiff in about two years (since November 2006), while plaintiff points to her testimony that Dr. Pond examined her on November 26, 2008, the date he completed the report. (Tr. at 35.) However, as the Commissioner correctly notes, the transcript contains no treatment records from Dr. Pond after November 2006. The ALJ may consider such a gap in treatment in evaluating a report.

Plaintiff also contends that the ALJ found the report unsupported by the "overall medical evidence," yet he failed to explain what that evidence was. See Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001) (explaining that the "not inconsistent" standard requires the ALJ to identify inconsistent evidence in order to give the treating source's opinion less than controlling weight). However, as the Commissioner also notes, the ALJ pointed to

25

Dr. Pond's records reflecting good recovery from the cervical fusion surgery, including a finding that she could lift up to thirty pounds. (Tr. at 16, 19; 335.) An ALJ may consider a conflict between a treating source's contemporaneous treatment notes and a later report imposing greater restrictions. See Griffith v. Callahan, 138 F.3d 1150, 1155 (7th Cir. 1998), overruled on other grounds by Johnson v. Apfel, 189 F.3d 561 (7th Cir. 1999). It was also appropriate for the ALJ to consider Dr. Pond's lack of expertise regarding arthritis.[17]

However, other reasons supplied by the ALJ are problematic. The ALJ noted that the Hatch evaluation was arranged by plaintiff's lawyer, but there is nothing inherently suspect about that. See Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) (holding that the mere fact that a medical report is provided at the request of counsel does not provide a legitimate basis for rejecting it); Worzalla v. Barnhart, 311 F. Supp. 2d 782, 797 (E.D. Wis. 2004) (stating that "it is counsel's job to marshal and present evidence supporting his or her client's claim," and that "a report cannot be rejected simply because the doctor preparing it was retained by the claimant's lawyer"); Kent v. Sullivan, No. 91 C 1474, 1992 WL 80518, at *11 (N.D. Ill. Apr. 9, 1992) ("In short, without some better explanation of why a doctor's report on a disability claimant is not to be trusted, it is meaningless to say that the report was 'prepared in anticipation of continuing litigation.'"). And, while Hatch saw plaintiff just once, Dr. Pond had a significant history with her and had access to all of her treatment records. In any event, the report indicates that Hatch's evaluation was based on objective testing, with plaintiff putting forth a "sincere effort" during the examination; it is not apparent why a lack of a record review

---

[17]Plaintiff argues that Dr. Pond may have changed his opinion on her lifting ability based on new medical facts related to her arthritis; however, the ALJ could reasonably question whether Dr. Pond had expertise in this area.

Case 2:09-cv-01101-LA   Filed 07/26/10   Page 26 of 33   Document 20

should devalue the report; and the record contains no support for the ALJ's assumption that the report was based on plaintiff's subjective complaints. See Barrett, 355 F.3d at 1067 (holding that "to give no weight at all to the physical therapist's report because Barrett had exaggerated her condition to the therapist . . . was arbitrary, since the therapist based her evaluation on physical tests and observation, not just on what Barrett told her").

The ALJ also erred in not considering Dr. Ehrhart's August 29, 2006 statement that it did not seem likely plaintiff could hold down a job. At the hearing, plaintiff's counsel's specifically drew the ALJ's attention to this statement (Tr. at 26), yet the ALJ made no mention of it in his decision. This is especially problematic given the ALJ's rejection of Dr. Pond's opinion based on Dr. Pond's lack of expertise regarding arthritis. Dr. Ehrhart had treated plaintiff for this condition for over a year at the time he made this statement. (Tr. at 168-69; 403.)

The Commissioner contends that Dr. Ehrhart could not determine whether plaintiff's inability to work was due to arthritis or depression, and that while he was qualified to speak to the former condition he lacked expertise to evaluate the latter. As indicated above, an ALJ can consider a treating source's specialty in evaluating his opinions, but the ALJ did not do that here, making the Commissioner's argument again impermissibly post-hoc. The Commissioner also notes that Dr. Ehrhart's opinion on disability based on psychiatric problems contradicts opinions from plaintiff's treating psychiatrist, Dr. Dy, who assigned her a GAF of 70 (indicative of mild symptoms) on August 29, 2006. (Tr. at 381.) While the ALJ reviewed Dr. Dy's records in evaluating plaintiff's depression, he did not rely on those records to reject Dr. Ehrhart's opinion; he simply ignored it. In sum, the ALJ did not make this point, and the Commissioner may not make it for him. See Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002) ("[T]he ALJ

27

(not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to [his] conclusion.' ") (quoting <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1176 (7th Cir. 2001)).  The ALJ must reconsider the treating source statements on remand.

## C.    Credibility

In evaluating the credibility of a claimant's allegations of pain or other disabling symptoms, the ALJ must follow a two-step process.  <u>See</u> SSR 96-7p.  First, the ALJ must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms.  If not, the symptoms cannot be found to affect her ability to work.  Second, if the ALJ finds that the claimant has an impairment that could produce the alleged symptoms, the ALJ must determine the extent to which they limit her ability to work.  SSR 96-7p.  In making this determination, the ALJ may not discredit a claimant's testimony about her pain or other limitations based solely on a lack of support in the medical evidence.  <u>Moss v. Astrue</u>, 555 F.3d 556, 561 (7th Cir. 2009). Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  The ALJ must provide specific reasons for a credibility determination, grounded in the evidence and articulated in the decision.  <u>See</u> <u>Lopez v. Barnhart</u>, 336 F.3d 535, 539-40 (7th Cir. 2003). Such reasons may not be implied or supplied later by the Commissioner's lawyers.  <u>Golembiewski</u>, 322 F.3d at 916.

28

The court generally reviews an ALJ's credibility determination deferentially, reversing only if it is patently wrong. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008) (citing Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006)). However, the court may reverse when the ALJ fails to comply with SSR 96-7p, including the Ruling's explanation requirement. See, e.g., Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003).

After summarizing plaintiff's testimony in this case, the ALJ concluded that while plaintiff's medically determinable impairments could be expected to produce the symptoms alleged, plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. at 15.) This is boilerplate and insufficient to support the determination.[18] See Brindisi, 315 F.3d at 787-88 (holding that a similar finding turned "the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating . . . credibility as an initial matter in order to come to a decision on the merits). However, the ALJ did go on to provide more specific reasons for discrediting plaintiff's testimony.

Regarding her arthritic complaints, the ALJ noted that plaintiff declined several medications offered by Dr. Ehrhart due to non-specific side effects, instead using over-the-counter pain relievers. He further noted that x-rays often revealed limited findings, and that Dr. Ehrhart opined that plaintiff's symptoms may be more tied to depression than active psoriatic

---

[18]As plaintiff notes, ALJs often use near identical language in their decisions. See, e.g., Weber v. Astrue, No. 09-C-0912, 2010 WL 1904971, at *5 (E.D. Wis. May 11, 2010); Evans v. Asrtrue, No. 3:09-CV-132, 2010 WL 610979, at *9 (N.D. Ind. Feb. 18, 2010); Skelton v. Astrue, No. 09-cv-296, 2009 WL 4730792, at *8 (W.D. Wis. Dec. 3, 2009). Indeed, such a statement can easily be inserted into virtually any decision, regardless of the facts.

arthritis. (Tr. at 15.) Regarding plaintiff's complaints of neck and shoulder pain, the ALJ noted that plaintiff underwent surgery on April 7, 2006 and seemed to recover well, reporting resolution of her symptoms in July 2006. (Tr. at 16, 18.) While plaintiff did, on April 27, 2006, complain of symptoms on the left side, similar to what she experienced on the right side before the surgery (Tr. at 271-72), the ALJ noted that exam findings were minimal and the record contained no further references to this problem (Tr. at 16). Regarding plaintiff's complaints of low back pain, the ALJ noted that exam findings were again limited, x-rays revealed only minimal degenerative changes, and plaintiff opted for conservative treatment, primarily over-the-counter medication and home exercises. (Tr. at 16-18.) Finally, regarding her complaints related to depression, the ALJ noted that plaintiff's condition improved significantly with treatment, with her GAF increasing from 60 in 2005 to 90 in 2008. Dr. Dy noted in June 2008 that plaintiff's depression was in remission. While plaintiff appeared depressed and withdrawn at the hearing, the ALJ saw no evidence to suggest that her depression was disabling, resulting in more than mild limitations. (Tr. at 17, 19.)

Plaintiff acknowledges that, after the boilerplate statement set forth above, the ALJ evaluated the medical evidence, but she notes that once she demonstrated a medically determinable impairment that could produce her symptoms, she did not have to prove the severity of those symptoms with medical evidence. However, the ALJ did not discredit plaintiff's allegations based solely on the medical evidence. He also considered plaintiff's daily activities, as reported both in a pre-hearing submission (Tr. at 14) and in her hearing testimony (Tr. at 15); her specific complaints of pain and limitations (Tr. at 15); the treatment modalities recommended by her doctors and those she chose to employ (Tr. at 16-17); and her use of medications and the alleged side effects (Tr. at 15).

30

Based on the foregoing, I cannot find the credibility determination patently wrong. However, because the matter must be remanded for other reasons, and for the reasons set forth in §§ D. and E. below, the ALJ should also take another look at this issue on remand.

## D.    State Agency Physicians

The state agency physical RFC consultants opined that plaintiff could perform light work, but with additional, non-exertional limitations in her ability to reach overhead, handle (gross manipulation), and finger (fine manipulation).  They specifically opined that grasping and fine fingering should be limited to "less than frequent."  (Tr. at 290.)  One of the state agency mental consultants (Dr. Mandli) found a severe mental impairment, with moderate limitations in several work-related areas.[19]  (Tr. at 309-10.)  However, the ALJ found plaintiff capable of the full range of sedentary work, with no non-exertional limitations (including in use of the hands or the mental capacity for work), and he did not discuss the state agency opinions to the contrary. Under SSR 96-6p, opinions from state agency medical and psychological consultants regarding the nature and severity of an individual's impairments must be treated as expert opinion evidence of non-examining sources; the ALJ may not ignore these opinions and must explain the weight given to them in his decision.

The Commissioner notes that the physical consultants found plaintiff capable of light work, a finding greater than the ALJ's determination that she was limited to sedentary work, which presumably makes the error in failing to discuss these reports harmless.  However, as discussed above, sedentary work requires good use of the hands, making the consultants' opinions on this issue important.  The Commissioner also argues that plaintiff has not shown

_____

[19]The other mental consultant (Dr. Edelman) found no severe mental impairment.  (Tr. at 356.)

that fine fingering is needed to do the telemarketer job, but according to the DOT "frequent" fingering is required, and at plaintiff's hearing the VE testified that a person limited to only occasional gross and fine manipulation could not perform plaintiff's past work. (Tr. at 51.) The Commissioner notes that Dr. Mandli found no significant limitations in thirteen of twenty categories, and Dr. Edelman found no severe mental impairment. However, despite some contradictory language within the decision, the ALJ did find a severe mental impairment, yet imposed no restrictions on her ability to work based on that impairment. The ALJ must on remand consider the consultants' opinions (and plaintiff's testimony) on these issues.

**E.     Mental Impairment**

Finally, as discussed in the previous section, the ALJ at step two found plaintiff's depression a severe impairment (Tr. at 12), but then included no mental limitations in the RFC, writing that "there is no evidence to suggest that her depression is disabling, resulting in more than mild limitations." (Tr. at 19.) There is evidence in the record supporting the latter conclusion; as the ALJ noted, Dr. Dy's records reflect significant improvement in plaintiff's mental condition with treatment, with her GAF increasing from 60 to 90. By 2008, Dr. Dy indicated that her depression was in remission. (Tr. at 17, 19.)

However, I cannot uphold a decision, even if there may be substantial evidence in the record to support it, where, because of internal contradictions or missing premises, the decision fails to build a logical bridge between the facts of the case and the outcome. Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). As indicated above, an "ALJ cannot find a severe mental impairment and then fail to include any limitations based on the impairment in the RFC." Henning, 578 F. Supp. 2d at 1014. On remand, the ALJ should consider plaintiff's testimony as to her mental health limitations, her claim that she lacks financial resources for continued

32

mental health treatment, and Dr. Mandli's report, and determine any appropriate mental limitations.  Any such limitations should also be presented to the VE.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of July, 2010.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

33